**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No.: 24-cr-133 |
| **Plaintiff,** | Hon. Kelley Brisbon Hodge |
| vs. | |
| **JASMINE WILLIAMS,** | |
| **Defendant.** | |

---

**DEFENDANT'S SENTENCING MEMORANDUM**

---

Pursuant to Title 18 U.S.C. § 3553(a), Federal Rule of Criminal Procedure 32, and Section 6A1.3 of the *United States Sentencing Guidelines,* Defendant, JASMINE WILLIAMS, by and through her counsel, Summer McKeivier and Joseph Mancano, hereby notifies the Court that she has received and reviewed the Presentence Report ("PSR") prepared in this case. For the reasons submitted to probation and incorporated herein, Defendant objects to the loss calculation and role enhancement pursuant to § 2B1.1 and § 3B1.1, respectively, and accordingly asserts that she qualifies for the zero-point offender departure under § 4C1.1. Defendant respectfully requests the Court grant a variance from the appropriately calculated guidelines and that a sentence below the low end of that range is sufficient but not greater than necessary to achieve the goals of sentencing.

## I. Introduction

Defendant, JASMINE WILLIAMS, pleaded guilty to all thirty-two (32) counts in the Indictment, which included violations of Title 18, United States Code, Section 1040(a), fraud in

connection with a major disaster, twenty-four (24) counts of Section 1343, wire fraud, and seven (7) counts of Section 1341, mail fraud.  No plea agreement was entered.

## II. Legal Standard

In *United States v. Booker*, the Supreme Court declared the federal sentencing guidelines advisory and directed sentencing courts to consider all the factors listed in 18 USC § 3553(a) to determine a sentence which is "sufficient but not greater than necessary".  543 US 220 (2005). After *Booker*, a sentencing court must (1) correctly calculate the advisory guideline range, (2) consider all the factors in 18 USC § 3553(a), and (3) impose a sentence which is sufficient but not greater than necessary to reflect the purposes of § 3553(a)(2).  *United States v. Cage,* 458 F3d 537, 540 (6th Cir., 2006).

The Supreme Court has clarified many post-*Booker* sentencing issues.  In *Gall v. United States*, 128 S Ct 586 (2007), the Supreme Court:

1. rejected a rule that required "extraordinary circumstances" to justify a sentence outside of the guideline range or a mathematical formula which uses the percentage of departure from the guidelines as a measurement of sufficiency;

2. rejected any notion, either explicit or implicit, that a sentence outside of the guidelines will be presumed unreasonable;

3. made it clear that the only standard for appellate review of a sentence is abuse of discretion;

4. recognized the district court's "superior position" in making an individualized assessment based on the facts present;

The relevant text of 18 USC §3553(a) provides:

The court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes in paragraph (2)…[A]nd shall consider-

(1)     the nature and characteristics of the offense and the history and characteristics of the defendant

(2)     the need for the sentence imposed-

      a.  to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense;

      b.  to afford adequate deterrence to criminal conduct;

      c.  to protect the public from further crimes of the defendant; and

      d.  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the kinds of sentence and sentencing range established for…the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines

(5)     any pertinent policy statements [of the Sentencing Commission]…

(6)     the need to avoid unwarranted sentence disparities of defendants with similar records who have been found guilty of similar conduct;…

To reiterate, this Court, before deciding what sentence is sufficient, but not greater than necessary, must consider the nature and circumstances of the offenses, Defendant's history and characteristics, and the concerns of § 3553(a)(2)-(7).  Because the Sentencing Guidelines are now only advisory, this Court can vary its sentence from the advisory guideline range so long as the Court imposes a sentence which meets the requirements of 18 USC § 3553(a).  *United States v. Collington,* 461 F3d 805, 808 (6th Cir., 2006).   There is no presumption or assumption that a sentence which varies from the guideline range is reasonable or unreasonable and this Court is free to disagree with the advisory guideline range on general policy grounds, individualized fact grounds, or because this Court concludes a different sentence is appropriate "regardless" of the guideline range.  *Rita v. United States*, 127 S Ct 2456, 2463, 2465, 2468 (2007).

3

Section 3553(a)(1) requires this Court to consider "the history and characteristics" of Defendant as a factor in the sentencing calculus.  It is particularly appropriate for a court to consider a defendant's history and characteristics because the guidelines do <u>not</u> address a defendant's personal characteristics except for criminal history.  *Rita*, 127 S Ct at 2473 and n.3.

**III. Application of Sentencing Factors pursuant to 18 USC § 3553(a)**

 **1. 18 USC § 3553(a)(1): The Nature and Circumstances of the Offense and the History and Characteristics of Defendant**

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States,* 518 U.S. 81, 113 (1996).

Jasmine Williams is a thirty-four-year-old single mother to a two-year old daughter, Tru Peace Williams, and a former foster parent. She appears before the Court having no prior history of violent conduct and with a record that reflects sustained efforts toward stability, caregiving, and lawful employment despite significant adversity.  For certain, Ms. Williams "does not seek to justify or excuse her conduct, and indeed, has admitted her guilt." *See United States v. M.B.*, 809 F. Supp. 319, 320 (D.N.J. 1993). However, she respectfully asks that the sentence imposed account for the circumstances of her life which provide essential context for understanding both her motives and the unlikelihood that similar conduct will recur.

Ms. Williams' personal history reflects profound and sustained financial insecurity from the earliest stages of her life. These conditions shaped her motivations and priorities long before the offense conduct at issue. She is one of three children born into a household marked by instability and parental absence. (PSR ¶ 51). Beginning with her father, who has been incarcerated since she was approximately nine months old. (*Id.*).

4

Raised primarily by her mother in North Philadelphia in an environment characterized by frequent moves, economic precarity, and exposure to violence, she recalls growing up in a small house in a neighborhood where shootings and drug activity were common, and children were routinely left unsupervised. (PSR ¶ 55-58). Housing instability was a recurring feature of her childhood. She moved multiple times, at times living with her maternal grandmother or one of her sisters, circumstances she attributed to her mother's inability to afford stable housing. (PSR ¶ 55). These experiences instilled in Ms. Williams an early and persistent awareness of financial fragility and its consequences.

Although her mother worked as a certified nursing assistant at a local hospital, the family nevertheless endured chronic deprivation. Ms. Williams recalls long periods during in which her mother was rarely home due to demanding work hours, leaving her to largely fend for herself, or dependent upon teenage siblings. (PSR ¶ 56). Food insecurity was common, and clothing was scarce. (*Id*.). Ms. Williams repeatedly washed and re-wore the same clothes, including hand-me-downs from her sister, and boiled water to take a bath when the gas was shut off, often lacking the basic necessities that many take for granted. (*Id*.). These conditions were formative, not merely episodic.

Compounding these hardships, Ms. Williams endured emotional, verbal, and physical abuse throughout her upbringing.  As the youngest child, she was frequently the primary target. She describes being struck with belts, phone cords, bats, and fists, even sometimes restrained so she could not leave the home by her mother before she went to work, and sustaining visible injuries that nevertheless went untreated. (PSR ¶ 57). She also recalls physical altercations with her siblings. (*Id*.) These experiences occurred alongside persistent neglect and instability, further reinforcing her sense that security, financial and otherwise, was both fragile and elusive.

At just sixteen years old, Ms. Williams suddenly and traumatically lost her mother, notwithstanding the complexities of their relationship, when she collapsed and died in her presence. (PSR ¶ 58). Forcing her immediate transition into adulthood without meaningful experience or direction. Following her mother's death, a longtime acquaintance of Ms. Williams described her as emotionally broken, lost, and without consistent guidance or support. **(*See* Exhibit A - Makia Underwood Letter).** For a period, she moved in with an older sister who, by Ms. Williams' account, did her best but lacked the capacity to provide the structure and stability a grieving teenager required. However, by seventeen, she was living independently in a one room basement efficiency. Reflecting on her childhood, Ms. Williams stated simply, "I would say I wish it was better." (*Id.*).

Despite these circumstances, Ms. Williams remained oriented toward self-improvement and stability. She was involved in church throughout her youth and participated in choir. (PSR ¶ 59). Although her academic path was uneven and marked by school transfers and disciplinary issues, she ultimately graduated from high school. (PSR ¶¶ 59, 87). Remarkably, she further pursued professional education in nursing. (PSR ¶ 90). She attended Prism Career Institute, completed a practical nursing program with a solid academic record, and earned licensure as a practical nurse. (PSR ¶¶ 90-91). She put herself through this training with the explicit goal of financial self-sufficiency and long-term stability for herself and for those who depended on her.

That consistent motivation to achieve financial security, after a lifetime without, has often misled Ms. Williams', evidenced by her appearance before this Court. As an adult, she entered and remained for years in an abusive relationship marked by violence and danger, including multiple shooting incidents in which she narrowly escaped injury. (PSR ¶¶ 62-64). Yet, this former partner, a convicted felon, also lavished her with exotic trips, expensive gifts and other perks

commonly associated with those that are "unemployed" but cash rich.  His lifestyle exhibited an extravagant image, which he required her to maintain and display.  In a social media post, Ms. Williams declared, "This trip started off horrible, all because he wanted me to get my hair, nails, eyelashes done…[but] you don't always have to be a bad b***h to go on a trip." (PSR ¶ 23).

It was during this tumultuous relationship that Ms. Williams engaged in the fraudulent scheme and then learned that she was pregnant.  She ultimately separated from that environment, became the sole caregiver to her child, and assumed responsibility not only for her daughter but also for vulnerable foster youth. (PSR ¶¶ 64-69).  She chose to foster teenagers precisely because she recognized herself in them and sought to provide the guidance she never received. (PSR ¶ 66).

Kenya Clark, who was sixteen years old when she was placed in Ms. Williams' home as a foster youth, wrote that she "had never been anywhere that truly felt like home" before being welcomed "with open arms" by Ms. Williams, whom she described as "the first person who made [her] feel like [she] belonged somewhere." **(*See* Exhibit B - Kenya Clark Letter).**  Kenya explained that Ms. Williams exposed her to experiences she had never had in foster care, including attending concerts and community events, shopping for properly fitted clothing and shoes, and learning basic life skills.  Prior to living with Ms. Williams, Kenya admitted, she "never knew [her] shoe size and wore whatever shoes were given to [her]."

Dana Williams, Kenya's biological mother, wrote that Ms. Williams consistently exceeded what was required of her as a foster parent. **(*See* Exhibit C - Dana Williams Letter)**.  She ensured that Dana's daughter felt supported, included, and valued as a young soon-to-be mother—three months pregnant at the time—while also prioritizing the continued involvement of both Dana and the child's father so that familial relationships could remain intact.  Ms. Williams created a stable

and nurturing home, celebrated milestones such as birthdays and a baby shower, and ensured that the child was well cared for and supported with dignity and respect.

Dana further observed that Ms. Williams prepared her daughter for adulthood by providing guidance on real-life responsibilities, including financial literacy and planning for independence. Despite the child's mental health challenges, Ms. Williams demonstrated patience, consistency, and understanding, providing a structured environment that allowed her to stabilize and transition into motherhood. Dana emphasized that Ms. Williams' involvement has had a lasting and positive impact on both her daughter and granddaughter.

Similarly, a longtime friend wrote that Ms. Williams has consistently demonstrated responsibility and care for others. (*See* **Exhibit D - Wallace Peeples Letter)**. According to Mr. Peeples, she is a devoted and present mother who prioritizes her child's well-being above her own comfort and routinely makes sacrifices to ensure stability, structure, and emotional support for her family. He described Ms. Williams as reliable, respectful, and thoughtful, noting that she offers compassion and encouragement without seeking recognition, reflecting strong character and a deep sense of social responsibility.

Ms. Williams has also sought to support those facing the same insecurities she once experienced. The Philadelphia Masjid Community Liaison Director, Charles Barr, who has spent years working in community engagement, violence prevention, and humanitarian service throughout the city, described Ms. Williams as someone who consistently demonstrates humility, reliability, and a genuine commitment to service. According to the Director, Ms. Williams regularly assisted with feeding families, distributing food, and supporting outreach efforts designed to stabilize and uplift underserved individuals and neighborhoods. She did so without seeking recognition, motivated instead by a sense of responsibility and accountability. He further

observed that Ms. Williams follows through on commitments, works well under direction, and carries herself with dignity, compassion, and maturity in emotionally demanding environments, qualities that reflect genuine character and social responsibility. **(*See* Exhibit E - Charles "Tone" Barr Letter)**.

Ms. Williams' offense conduct cannot be divorced from this context. She does not minimize her actions, nor does she suggest that hardship excuses criminal behavior. The record demonstrates that her conduct was driven not by greed or excess, but by a deeply ingrained need for financial security rooted in deprivation, trauma, and responsibility for others; and at the time, likely influenced by individuals accustomed to such inflated and illegitimate sources of income. Rather, her life reflects a pattern of striving, often imperfectly, to create stability, safety and connection, where none was given. That history bears directly on her misguided culpability and her risk of recidivism in the future. Ms. Williams views her conduct as regrettable and is remorseful for its impact on those in real need.  She respectfully requests the Court take into consideration all aspects of her character, not just her conduct, and exercise leniency when determining the appropriate sentence to impose.

2. **18 USC § 3553(a)(2)(A), (B) and (C): The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense, Afford Adequate Deterrence to Criminal Conduct and the Need for the Sentence Imposed to Protect the Public from Further Crimes by Defendant**

This conviction is the first Ms. Williams has suffered, and she has never served any time in custody.  Therefore, any custodial sentence is sufficient to reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense.  The conduct for which she is in front of the court today will not be repeated.  Personally for Ms. Williams, the separation from her very young daughter, from whom she has never been apart, will provide the ultimate

deterrence.   The sentencing statute also requires the Court to consider the "need for the sentence

imposed…to afford adequate deterrence to criminal conduct" generally and the need to "protect

the public from further crimes of the defendant." 18 U.S.C. §§ 3553(a)(2)(B) & (C). While many

believe that the higher the sentence, the greater the effect in deterring others, the empirical research

shows no relationship between sentence length and deterrence. The general research finding is that

"deterrence works," in the sense that there is less crime with a criminal justice system than there

would be without one. The most pertinent question for this Court is whether a lengthy term of

imprisonment is necessary to serve this purpose of sentencing.   Research has repeatedly shown

that there is no difference between the deterrent effect of probation and that of imprisonment for

white-collar offenders. See David Weisburd, et. al.; *Specific Deterrence in a Sample of Offenders*

*Convicted of White Collar Crimes*, 33 Criminology 587 (1995); Avi D. Gabbay*, Exploring the*

*Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8

Cardozo J. Conflict Resol. 421, 448-449 (2007).   Therefore, under Ms. Williams' particular

circumstances, the answer is a resounding "no."

Further, recent research has concluded that "the current level of incarceration has reached

a point where diminishing returns have rendered the crime reduction effect of incarceration so

small, it has become nil"[1].  It is the certainty of sentence, not the length or severity of the sentence,

that imparts the deterrent effect.  Therefore, as little proof exists that long periods of incarceration

result in crime reduction, sufficient deterrence can be achieved with a below-range sentence. The

Government can point to nothing - no study, no empirical evidence - in support of the position that

guideline incarceration is any more effective, in terms of specific or general deterrence.

In contrast, there is evidence demonstrating that prison may heighten the risk of recidivism.

---

[1]Oliver Roeder, et.al., Brennan Center for Justice, What Caused the Crime Decline 7 (2015),
http://www.brennancenter.org/sites/default/files/analysis/Crime_rate_report_web.pdf.

*See* e.g., THE SENTENCING PROJECT, INCARCERATION AND CRIME: A COMPLEX RELATIONSHIP (2005) ("The rapid growth of incarceration has had profoundly disruptive effects that radiate into other spheres of society. The persistent removal of persons from the community to prison and their eventual return has a destabilizing effect that has been demonstrated to fray family and community bonds and contribute to an increase in recidivism and future criminality.") (Footnote and citation omitted).

Finally, the protection of the public factor, which considers "the likelihood that [a defendant] will engage in future criminal conduct," also favors leniency in Ms. Williams' sentencing. *Pepper v. United States*, 562 U.S. 476, 492 (2011). As an initial matter, research by the United States Sentencing Commission reveals that fraud has the lowest percentage of recidivism among studied crimes. "Recidivism Among Federal Offenders: A Comprehensive Overview" (United States Sentencing Commission, March 2016).

Moreover, Ms. Williams is a first-time offender. This is her first ever arrest and conviction, making her exceedingly unlikely to reoffend. *See* Ruben Castillo et al., *Recidivism and the "First Offender"* (May 2004), U.S. Sentencing Commission (finding that the recidivism rate of zero point offenders "is substantially lower" than the rates for offenders with only one criminal history point and that the "low recidivism rate" of a subset of zero point offenders made the group "stand out"); Tracy Kyckelhahn and Tricia Cooper, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* (2017), U.S. Sentencing Commission (noting that "offenders who had no prior contact with the criminal justice system had a rearrest rate 11.7 percentage points lower than offenders with prior contact (25.7% compared to 37.4%)" and that "[b]oth groups had a lower rearrest rate than offenders with one criminal history point (46.9%)").

Indeed, for a true first-time offender like Ms. Williams, a within-range sentence can be

11

*greater* than necessary to prevent reoffending. *United States v. Fathalla*, 2008 WL 4501057, at *4 (E.D. Wis. Sept. 29, 2008) (sentencing defendant to home confinement after noting first-time offender status); *United States v. Baker,* 445 F.3d 987, 992 (7th Cir. 2006) (affirming a below-Guidelines sentence based in part on the defendant's "lack of criminal history"); *United States v. Paul,* 239 Fed. Appx. 353, 354 (9th Cir. 2007) (vacating a within-Guidelines sentence because "the district court did not adequately consider . . . strong mitigating evidence" that the defendant "was a first-time offender with absolutely no criminal record whatsoever.").

3.  **18 U.S.C. § 3553(a)(2)(D): The Need for the Sentence Imposed to Provide the Defendant with Needed Educational or Vocational Training, or Other Correctional Treatment in the Most Effective Manner**

Ms. Williams will take full advantage of any educational or vocational training provided by the BOP.  It is almost certain that based on the nature of this conviction she will lose her nursing license.

4.  **18 U.S.C. § 3553(a)(3) and (a)(4): The Kinds of Sentences Available and the Sentencing Range Established**

Jasmine Williams has pleaded guilty to all thirty-two (32) counts in the Indictment, without the benefit of a plea agreement, not to avoid responsibility, but to advocate that she is only held accountable for her actions.  Broken down the charges include one (1) count of aiding and abetting fraud in connection with a major disaster, twenty-four (24) counts of wire fraud, and seven (7) counts of mail fraud, all which carry a statutory maximum sentence of thirty (30) years imprisonment.  The defendant disagrees with the guideline calculations in the PSR and submits a more accurate guideline range of 46-57 months based on her submitted objections and the application of the zero-point offender departure.

Prison sentences are not a punishment of first choice for non-violent offenders with no criminal history. In fact, Congress directed the Sentencing Commission to "insure that the

guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j). The United States already has a very serious problem with mass incarceration, leading the entire world in the total number of people in prison.  For that reason, "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who post the most dangerous threat to society."  Pub L. No. 98-473, title II, §239, 98 Stat. 2039 (1984) (set forth at 18 USC § 3551 note).   However, all the indicted counts are elevated to Class B felonies due to the disaster declaration under the Stafford Act.  42 U.S.C. § 5121 *et seq.*   Therefore, Ms. Williams is ineligible for probation, and a term of imprisonment must be imposed.

Though it is paramount to keep in mind that the Supreme Court has instructed that the Guidelines offer only a "rough approximation" of a fair and appropriate sentence. *Rita v. United States*, 551 US 338, 350 (2007). It is far more important for a district court to "consider all the factors set forth in § 3553(a) to guide its discretion at sentencing," and a sentencing decision "may attract the greatest respect" when it is uniquely tailored to the individual facts of the offender and the offense. *Peugh v. United States*, 469 U.S. 530, 536-37 (2013). Put another way, the cold, mathematical analysis of counting offense level points should not be a "black stain on common sense." *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008). Nor should it deprive judges of the ability to exercise mercy and compassion in the face of an offender who is deserving of them. *See, e.g., United States v. Speed Joyeros*, S.A., 204 F. Supp. 2d 412, 442 (E.D.N.Y. 2002) ("Requiring Federal judges to apply the sentencing guidelines mechanically, without trying to fathom the defendant's heart and mind . . . threatens a devastating effect on the judges themselves—the destruction of their humanity."); *United States v. Coughlin*, 2008 U.S. Dist.

13

LEXIS 11263, at *9 (W.D. Ark. Feb. 1, 2008) ("A court that succumbs to apathy, bred by repetition, will cease to see defendants as individuals, with pasts and potentials, with humanity and promise.").

In applying this directive and evaluating the 3553 factors, a lengthy term of imprisonment such as that recommended by probation, or even within the guideline range calculated based on Defendant's objections, would be greater than necessary, and potentially result in the negative impact on Ms. Williams and her daughter, as suggested in THE SENTENCING PROJECT, INCARCERATION AND CRIME: A COMPLEX RELATIONSHIP (2005).   No credible argument can be made that she poses a threat or is a danger to anyone.  The time Ms. Williams must serve in prison will satisfy the goals of sentencing for a young, single mother with no prior criminal history.   Based on her record of learning from and persevering after adversity, a sentence below the appropriately calculated guideline range would be sufficient but not greater than necessary for this defendant.

## IV. Reply to Government's Response to Objections

### 1.  Loss Calculation

The Defendant incorporates her objections and arguments submitted to probation regarding loss.  After discussions with the Government, the parties have agreed to some reductions and removal of certain registrations from each of its calculations.  However, the Defendant maintains the underlying argument common to each of the categories as previously submitted – that money paid to the Defendant alone is insufficient to establish that fraud was committed or that the Defendant was aware of fraud in the initial submissions, based on information provided by the registrants.

14

## 2.  Role Enhancement

Defendant also incorporates her previously submitted objection and argument to the role enhancement for leader/organizer.  As to the Government's response to her objection, Defendant submits the following reply:

The Government is correct, as the defense originally argued and supported with controlling authority, that §3B1.1 applies "to situations where an individual is a leader or organizer of individuals who participate together in committing one or more criminal acts," and that those participants need not be convicted so long as their own criminal conduct made the offense possible. *United States v. Belletiere*, 971 F.2d 961, 968-69 (3d Cir. 1992). The Government is also correct that *Belletiere* draws a critical distinction between coordinated criminal activity and a series of independent, bilateral transactions. Where the Government's analysis fails, however, is in collapsing that distinction entirely and recasting mutual necessity as leadership or control.

In *Belletiere,* the Third Circuit expressly rejected the notion that §3B1.1 applies merely because a defendant commits multiple crimes with different individuals whose participation is necessary to each offense. The Court explained that where a defendant engages in "a series of solitary, non-related crimes," such as repeated drug sales to different buyers, and there is no "organization" or "scheme" between the defendant and those buyers, or among the buyers themselves, the defendant cannot be said to have "led" or "organized" them within the meaning of §3B1.1. *Id*. at 969-70. The animating principle is not whether other individuals were criminally involved, but whether the defendant exercised organizational authority or leadership over them in a coordinated criminal enterprise. *See id*. at 971 (rejecting the §3B1.1 enhancement where, despite the PSR's characterization of the defendant as the leader of an extensive cocaine operation who exercised decision-making authority and supplied large quantities of drugs, the evidence showed

15

only a series of unrelated drug sales to different buyers, none of whom were "led," "organized," or "answerable" to the defendant). Here, quite simply, there was no organization or scheme beyond the defendant and each individual applicant, and there was no relationship whatsoever among the various applicants themselves. *See id*. at 970 (quoting *United States v. Reid*, 911 F.2d 1456, 1465 (10th Cir. 1990) ("the defendant's supervisory or managerial status is not sufficiently proved by indicating a mere buyer/seller relationship between the defendant and the alleged group or network of participants.").

The Government's attempt to distinguish *Belletiere* on the ground that FEMA applicants provided the "input" that "fueled the fraud scheme" fundamentally misunderstands the principle. The fact that another person's knowing participation is necessary to complete an offense does not transform that person into a subordinate participant in a hierarchy, nor does it confer leadership status on the defendant. Taken to its logical conclusion, the Government's reasoning would collapse the distinction drawn in *Belletiere* entirely: a drug seller would qualify as an organizer or leader simply because buyers supply the demand or funds necessary for the transaction to occur. The Third Circuit expressly rejected that approach. In virtually every fraud offense, as in drug distribution cases, the offense cannot occur without some form of participation by another individual. But necessity is not control, and mutual dependence does not establish leadership.

Indeed, the Government's analogy exposes the flaw in its position. By suggesting that this case differs from a buyer-seller relationship because the applicants supplied information rather than money, the Government merely substitutes one form of bilateral exchange for another. But the Third Circuit has already rejected the notion that such exchanges establish leadership. As the court explained, "the government must prove at least an interdependence between the defendant and the supplier or customer that would support an inference that the supplier or customer for

16

personal use in answerable to the defendant." *Id*. at 970 (quoting *Reid*, 911 F.2d at 1465 (10th Cir. 1990)). "Merely because a crime is extensive (several purchasers and sales of drugs) does not automatically mean that a defendant organizes or leads his suppliers or his customers who buy for personal use." *Id*. What matters is whether the defendant exercised decision-making authority over others, coordinated their actions as part of a unified enterprise, or occupied a superior role in a criminal hierarchy.

Here, the record shows none of that. Each FEMA applicant acted independently and for his or her own benefit by choosing to provide information in exchange for assistance in obtaining funds. There is no evidence of coordination among applicants, no evidence that the defendant directed how or when they acted beyond requesting information necessary to perform her own role, and no evidence that she controlled their conduct before, during, or after submission of the applications. That the defendant and each individual applicant later split proceeds does not transform the relationship into one of leadership. It merely confirms that each side performed a discrete function in a transactional arrangement, no different in structure from a series of buyer-seller transactions that *Belletiere* holds cannot support an organizer-or-leader enhancement.

At bottom, the Government's attempt to distance the facts here from a traditional buyer-seller relationship is unpersuasive. Under the Government's logic, any transaction in which payment is agreed upon in advance and contingent on success would evidence organizational control. That reasoning would improperly transform ordinary contingent-fee arrangements into proof of leadership, even though such agreements merely reflect the terms of compensation, not authority over the counterparty's conduct. Here, as in a buyer-seller context, each applicant independently chose to participate, agreed to the terms of the exchange, and retained autonomy

throughout. That transactional structure does not establish leadership within the meaning of §3B1.1.

Nor does the Government's reliance on an after-the-fact alleged "public shaming" [in the event of non-payment of the agreed-upon contingency fee by the applicant] cure this defect. If such conduct were sufficient, then every independent contractor who insists on being paid for illegal services would automatically become an "organizer or leader," a result flatly inconsistent with §3B1.1 and controlling precedent.

In short, the Government's theory equates participation with subordination and mutual dependence with leadership. The applicants here may well bear criminal responsibility, but that alone does not establish that the defendant organized, led, or exercised authority over them in a coordinated criminal scheme. To accept the Government's position would erase the limiting principle *Belletiere* articulated and expand §3B1.1 to cover virtually any multi-person offense, contrary to the text of the Guideline and decades of precedent.

Accordingly, even accepting the Government's factual narrative, the legal conclusion does not follow. The record supports, at most, a series of parallel, bilateral transactions among willing participants, not an organized criminal enterprise led by the defendant. Section 3B1.1 therefore does not apply.

## Requested Recommendation to the Bureau of Prisons Concerning Place of Confinement

If a term of imprisonment is imposed, as part of its judgment of sentence, the defendant requests that the Court include the following recommendation:

> The Court strongly recommends that the Bureau of Prisons designate the defendant to FPC Alderson, a minimum-security camp, to place her close to home and which provides many of the vocational and rehabilitative programs in which Ms. Williams would like to participate.  The Court also strongly recommends that defendant not be designated to a medium security prison, as she has no prior adult incarceration,

and which thereby would unnecessarily place her with offenders who have more serious criminal histories, offenses or longer sentences.

While the Bureau of Prisons is required to consider the Court's recommendation in determining the place of a prisoner's imprisonment, *see* 18 U.S.C. § 3621 (b)(4), in counsel's experience, the Bureau is more likely to follow a Court's recommendation of a particular institution if the Court provides reasons to designate a particular prison. The defendant therefore requests that the Court include the above recommendation in its judgment.

## IV. Conclusion

Defendant acknowledges that punishment for her crime is appropriate and her sentence must reflect the seriousness of her offense, promote respect for the law, and provide just punishment. Ms. Williams respectfully submits that a sentence less than the accurately calculated range is sufficient but not greater than necessary to satisfy the objectives of sentencing.

Respectfully Submitted,
CHAPMAN LAW GROUP

Dated: January 05, 2026        /s/ *Summer McKeivier*
Summer McKeivier
*Counsel for Defendant Williams*
1441 W. Long Lake Rd., Ste. 310
Troy, MI  48098
T: (248) 644-6326
SMcKeivier@ChapmanLawGroup.com

## PROOF OF SERVICE

I hereby certify that on January 05, 2026, I presented the foregoing paper to the Clerk of the Court for filing using the ECF system.

/s/ *Summer McKeivier*
Summer McKeivier
*Counsel for Defendant Williams*
SMcKeivier@ChapmanLawGroup.com

19